## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TONIESHA JACKSON, ) | |
| ) | Case No. |
| Plaintiff, ) | |
| v. ) | |
| ) | COMPLAINT and JURY |
| ) | DEMAND |
| PH HALSEY HANCOCK PARTNERS, LLC, ) | |
| and LEMLE & WOLFF, INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |

### I.  PRELIMINARY STATEMENT

1. This is an action by Plaintiff Toniesha Jackson pursuant to (1) the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq. ("FHA"), including housing discrimination based on gender including gender identity, (2) supplemental claims under the New York State Human Rights Law, N.Y. Exec. Law §290 et seq. ("NYSHRL") and (3) supplemental claims under the New York City Human Rights Law, N.Y.C. Administrative Code § 8-107, et seq. ("NYCHRL"). Plaintiff seeks declaratory and injunctive relief to end the harassment and discrimination, in addition to compensatory and punitive damages, and other available relief.

### II.  PARTIES

2. Plaintiff Toniesha Jackson is a citizen of the United States and a resident of Kings County, New York.

2. Defendant PH Halsey Hancock Partners, LLC. ("PH HHP") is a corporation organized and existing under the law of the State of New York with its principal address at 703 Lexington Avenue, Brooklyn, New York 11221.

3. At all times relevant herein, Plaintiff was a resident of Unit 3A (the "Unit") at 243 Hancock Street, Brooklyn, New York 11216 (the "Development").

4. The Unit is a dwelling as defined in the FHA.

5. The Development is a publicly-assisted housing accommodation as defined in the NYSHRL and NYCHRL.

6. Defendant PH HHP owns the Unit.

7. Lemle & Wolff, Inc. ("Lemle & Wolff"), with corporate headquarters at 5925 Broadway, Bronx, New York 10463 was at all relevant times a property manager hired by PH HHP to manage the Development.

### III.   PROCEDURAL HISTORY

15. Plaintiff has taken all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

### IV.   JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 3613, 28 U.S.C. §§ 1331 and 1343 in that this is a civil action seeking to redress the deprivation of the right to fair housing and equal protection secured to the Plaintiffs by the Fair Housing Act, and pursuant to 28 U.S.C. § 1337 in that defendants' unfair housing practices create a restraint on commerce; and pursuant to 28 U.S.C. §§ 2201 and 2202 for declaratory and injunctive relief.

17. The Court has jurisdiction of the state law supplemental claims pursuant to 28 U.S.C. § 1367, which arise out of a common nucleus of operative facts, circumstances, occurrences, witnesses and evidence, and are thereby so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution,

18. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) because all Defendants are residents of New York, and because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York.

## V. FACTS

19. Plaintiff is a female citizen of the United States of America.

20. Plaintiff has a female gender identity.

21. Plaintiff has a feminine gender expression.

22. Plaintiff is a woman who is transgender.

### A. Sex, Gender, Gender Expression, and Gender Identity

24. *Sex* is a term that includes gender, gender expression, and gender identity within its meaning.

25. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

26. *Gender* refers to cultural expectations specific to the sexes.

27. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

28. *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

29. Gender identity is intractably rooted at a very early age and cannot be changed.

30. *Transgender individuals* are people who have a gender identity that does not match the sex they were assigned at birth.

31. *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as *gender transition* or *transition*.

32. Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

33. *Gender dysphoria* is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress with the sex they were assigned at birth.

34. Gender dysphoria is found in the *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* of the American Psychiatric Association.

35. Based on many scientific studies during the past two decades, gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system.

36. Scientific studies have shown that transgender persons have brain structures that are typical of non-transgender people with the same gender identity. For example, transgender women (i.e., individuals whose sex assigned at birth is male but who have female gender identity) have brain structures that are similar to those of non-transgender women.

37. It is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she).

**B. Harassment and Hostile Environment**

38. Plaintiff signed a lease with PH HHP, the owner of the Unit, on or about December 31, 2019.

39. She moved into the Development at 243 Hancock Street on or about January 1, 2020.

40. At all relevant times herein, she has been a resident of the Development and has occupied the Unit as her dwelling.

41. Prior to taking up residence at the Development, Ms. Jackson was a resident of Pam's Place, a shelter for houseless persons located at 40-03 29th St, Long Island City, New York.

42. Ms. Jackson has a history of mental health issues, and manages her conditions with the support of her mental health team.

43. She is enrolled in college, and is currently studying at home full-time due to the COVID-19 pandemic.

44. Ms. Jessica Leonard was also a resident of Pam's Place prior to moving into the Development.

45. She was offered housing at the same time as Ms. Jackson.

46. Ms. Leonard moved into Unit 4A, directly above Ms. Jackson, on or about January 1, 2020.

47. Ms. Jackson had met Ms. Leonard briefly while resident at Pam's Place, but they did not have a social relationship prior to moving to the Development.

48. On information and belief, Ms. Leonard became aware that Ms. Jackson was a transgender woman prior to moving into the Development.

49. Although she did not initially treat Ms. Jackson with hostility, her behavior toward Ms. Jackson was inappropriate.

50. Ms. Leonard would attempt to enter the Unit without Ms. Jackson's authorization, jiggling the door handle and knocking on Ms. Jackson's door demanding to be let in.

51. This happened on multiple occasions.

52. These incidents made Ms. Jackson uncomfortable.

53. Ms. Jackson told Ms. Leonard her behavior was inappropriate.

54. During February 2020, Ms. Leonard knocked on Ms. Jackson's door aggressively for a long period of time, demanding to be let in while Ms. Jackson was in the bath.

55. After telling Ms. Leonard she was busy and asking her what she wanted, Ms. Leonard responded, "I'll talk to you later."

56. Following this incident, Ms. Leonard began a campaign of ongoing harassment of Ms. Jackson.

57. Ms. Leonard made discriminatory comments to Ms. Jackson about her gender, referring to her as a "fake-ass bitch" and "not a real woman."

58. These discriminatory comments were made to Ms. Jackson on several occasions.

59. After making these discriminatory comments, Ms. Leonard began to make loud noises, stomping and dropping things on the floor above the Unit during evening quiet time hours.

60. The frequency of these new noises by Ms. Leonard after her discriminatory comments show that they are intentionally made in order to harass Ms. Jackson based on her gender identity.

61. This harassment is continuous and occurs throughout the night.

62. Ms. Jackson is unable to sleep as a result, a serious matter for a college student addressing mental health issues.

63. After her discriminatory comments, Ms. Leonard also began shouting threats and discriminatory comments based on gender identity at Ms. Jackson through the ceiling of the Unit, including threatening physical harm to Ms. Jackson.

64. Ms. Leonard engages in this behavior because she is hostile to Ms. Jackson's gender identity.

65. This has caused Ms. Jackson significant emotional distress and has led to a decline in her mental health.

C. **Failure by Defendants to Address Hostile Environment and Harassment**

66. Following the incident in which Ms. Leonard demanded access to the Unit while Ms. Jackson was in the bath, Ms. Jackson made a complaint to her on site case manager, Nicole Johnson.

67. She notified Ms. Johnson that Ms. Leonard was harassing her based on her gender identity and asked Ms. Johnson to make sure Ms. Leonard did not approach her again.

68. In spite of this, Ms. Leonard continued to harass and threaten Ms. Jackson.

69. Ms. Johnson has consistently dismissed Ms. Jackson's concerns, telling her that Ms. Leonard "has her own problems to deal with."

70. On information and belief, Ms. Johnson is hostile to Ms. Jackson because of her gender identity.

71. On one occasion in which Ms. Leonard was shouting hostile remarks, stomping, and dropping things on the floor above the Unit late at night, Ms. Jackson called the on-site security guard, Mr. Johnson.

72. Security Guard Johnson came to the Unit to witness the harassment.

73. He told her he was "horrified" and that he was sorry she had to go through that.

74. He agreed to record the incident in his logbook.

75. On information and belief, no further action was taken by PH HHP or Lemle & Wolff as a result of this complaint.

76. Ms. Jackson has had to resort to calling the police regarding Ms. Leonard's behavior.

77. On at least three occasions, the police came to the building to request that Ms. Leonard stop harassing Ms. Jackson.

78. Ms. Jackson has noticed a brief respite in the harassment after these corrections, but ultimately Ms. Leonard returns to her behavior in a matter of days.

79. As well as reporting each incident to Ms. Johnson, she has notified the Director of Supportive Housing, Ms. Samantha Walker, and the Chief Program Officer, Ms. Rita Taddonio.

80. As an attempt at resolution, she was offered the option of a face-to-face conversation with Ms. Leonard that would be mediated by Ms. Johnson.

81. Although Ms. Leonard's behavior was threatening to Ms. Jackson and made her nervous, she underwent this process.

82. At this meeting Ms. Leonard defended her behavior, stating that the noise was simply a result of the way she walked and was not intentional.

83. This does not reflect the reality that the dropping and stomping noises occur sporadically.

84. In addition, it does not explain Ms. Leonard's other behavior, including the violent threats, discriminatory comments, and attempts to enter the Unit without authorization.

85. Ms. Jackson was offered the use of a "noise machine" by PH HHP staff to address the nuisance of Ms. Leonard's stomping.

86. The noise machine does not address the harassment or threats by Ms. Leonard, and is not an effective solution for discrimination.

87. In spite of Ms. Jackson having called Security Guard Johnson to witness the harassment, and the police intervention on Ms. Jackson's behalf, Defendants maintain that Ms. Jackson has imagined or hallucinated the discriminatory comments and threats by Ms. Leonard as a result of her mental health issues.

88. Ms. Jackson's mental health issues do not cause her to hear stomping and banging from the ceiling above, and do not cause her to see and hear discriminatory threats by Ms. Johnson. Her mental health issues are not related to the discrimination, though they have been exacerbated by

it, particularly the deceptive "gaslighting" manipulation employed by Ms. Johnson to deny her actions.

89. Ms. Jackson continues to work with her mental health support team and has shared her concerns about the harassment with them.

90. Ms. Jackson's psychiatrist has had to increase the dosage of her prescription medication to address the worsening of her mental condition as a result of the discrimination.

91. Ms. Jackson has been offered the option of moving to another unit in the building.

92. She does not wish to move as she fears this will validate Ms. Leonard's discriminatory behavior and cause the harassment to continue in the shared spaces of the building.

93. In addition, moving is a disruptive event that may have deleterious effects on Ms. Jackson's mental health, particularly when forced out due to discrimination based on her identity through no fault of her own, making her feel alone and abandoned by those who receive money from the city and state to care for her.

94. On information and belief, Ms. Leonard is eligible for alternative housing outside the Development.

95. Sher has been asked to transfer to another building, but has declined to do so.

96. Defendants insist that they are not able to move Ms. Leonard involuntarily, though, in fact, it is within their power to do so under the agreements between Defendants and the city and state, and their rights as landlord and program manager.

97. While it may require Defendants to take actions that they prefer not to engage in for reasons of their own, Ms. Jackson should not be made the victim of discrimination and harassment because large corporations with their own interests insist incorrectly that they can do nothing.

98. The discriminatory harassment of Ms. Jackson by Ms. Leonard is ongoing and has not been dealt with promptly and effectively by PH HHP or Lemle & Wolff.

## CAUSES OF ACTION

### COUNT 1
### Housing Harassment and Hostile Environment
### On the Basis of Sex
### 42 U.S.C. § 3601, et seq. and 24 CFR § 100.600, et seq.

167. Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein.

168. Plaintiff is a member of a protected category with regard to sex.

169. Defendants were aware of, condoned and/or ratified a campaign of harassment and discrimination by Ms. Leonard because of and motivated by sex and gender identity.

170. This harassment was related to and in connection with the availability, rental, and use or enjoyment of Plaintiff's dwelling, and the terms, conditions, and privileges of the rental thereof, and the provision and enjoyment of services and facilities, and the availability, terms, and conditions of a residential real estate-related transaction.

171. Ms. Jackson was targeted for acts of harassment by Ms. Leonard because of Ms. Jackson's sex and gender identity, which Ms. Leonard carried out by a campaign of disturbing Ms. Jackson's quiet enjoyment of her rental unit as set forth above.

172. Ms. Leonard also made statements on many occasions to Plaintiff that were derogatory based on her sex and gender identity.

173. Defendants PH HHP and Lemle & Wolff knew or should have known of Ms. Leonard's harassing statements and harassing conduct by virtue of Ms. Jackson's many complaints to security, her case manager, and to the police.

174. By failing to take prompt and effective action to address Ms. Leonard's discriminatory behavior, Defendants perpetuated, condoned and/or ratified the hostile environment based on sex and gender identity.

175. This harassment was and is severe and pervasive.

176. This hostile environment unreasonably interfered with Plaintiff's reasonable enjoyment of her property.

177. The hostile environment began at or about the time Plaintiff moved into the building and is continuous.

178. The effects of the hostile environment alleged herein were pervasive because they were felt by Plaintiff daily. Plaintiff felt daily humiliation and despair as a result of her reasonable fear of continued harassment at any moment. It also made it hard for her to sleep as she was continually anticipating more noise from Ms. Leonard.

179. Defendants' actions occurred because of Plaintiff's sex and gender identity.

180. Defendants, as the owners and operators of the property, respectively, are liable for the violation of Plaintiffs' rights because they knew or should have known of the discrimination and failed to take prompt and effective action to address it.

181. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, and other pecuniary and non-pecuniary losses.

182. Defendants acted intentionally or in a manner deliberately indifferent to the federally protected rights of Plaintiff, making them liable for punitive damages.

## COUNT 2
### Housing Harassment and Hostile Environment
### Because of Sex and/or Gender Identity
### NYSHRL
### N.Y. Exec. Law §290 et seq.

183. Plaintiff Ms. Jackson incorporates by reference the preceding paragraphs as if fully set forth herein.

184. Plaintiff is a member of a protected category with regard to her sex and gender identity.

185. Plaintiff was targeted for harassment and subjected to a hostile environment because of her sex and gender identity.

186. This harassment was and is far more than petty slights and inconveniences.

187. This hostile environment unreasonably interfered with Plaintiff's reasonable enjoyment of her property.

188. The hostile environment began at or about the time Plaintiff moved into the building and is continuous.

189. The effects of the hostile environment alleged herein were felt by Plaintiff daily. Plaintiff felt daily humiliation and despair as a result of her reasonable fear of continued harassment at any moment.

190. Defendants were on notice of the hostile environment and did not undertake prompt and effective efforts to address it, as detailed herein.

191. By engaging in the conduct described above, Defendant discriminated against Ms. Jackson intentionally, knowingly or recklessly with regard to her state protected rights, for which Plaintiff seeks punitive damages.

192. As a direct and proximate result of Defendants' unlawful discrimination, Ms. Jackson incurred damages including but not limited to emotional pain, suffering, inconvenience, loss of

enjoyment of life, and humiliation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendant's unlawful hostile environment.

## COUNT 3
### Housing Harassment and Hostile Environment
### Because of Sex and/or Gender Identity
### NYCHRL
### N.Y.C. Administrative Code § 8-107, et seq.

193.   Plaintiff realleges all previous paragraphs as if fully set forth herein.

194.   Ms. Jackson was targeted for harassment and subjected to unequal treatment because of her sex and gender identity in violation of the New York City Human Rights Law.

195.   This hostile environment unreasonably interfered with Plaintiff's reasonable enjoyment of her property.

196.   The hostile environment began at or about the time Plaintiff moved into the building and is continuous.

197.   The effects of the hostile environment alleged herein were pervasive because they were felt by Plaintiff daily. Plaintiff felt daily humiliation and despair as a result of her reasonable fear of continued harassment at any moment.

198.   Defendants are directly liable for the deprivation of Ms. Jackson's rights by exercising their authority to allow, perpetuate, condone and ratify a hostile environment based on sex and gender identity.

199.   Defendant PH HHP and Lemle & Wolff aided and abetted in the deprivation of Ms. Jackson's rights because of discrimination against her by repeatedly failing to take prompt and effective action to stop the discriminatory conduct giving rise to her claim for hostile environment.

200. As a direct and proximate result of Defendants' unlawful discrimination, Ms. Jackson has incurred damages including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, and other pecuniary and non-pecuniary losses.

201. By engaging in the conduct described above, Defendant PH HHP and Lemle & Wolff discriminated against Ms. Jackson with willful or wanton negligence, or recklessness or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, with regard to Ms. Jackson's protected rights under NYCHRL § 8-107, for which Plaintiff seeks punitive damages.

## JURY DEMAND

202. Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the acts, practices, and omissions complained of herein by Defendants are unlawful and violate the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law;

B. Permanently enjoin Defendants PH HHP and Lemle & Wolff, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against residents based on sex and gender identity;

C. Order Defendants PH HHP and Lemle & Wolff to institute and carry out policies, practices, programs, and training for employees which eradicate the effects of Defendants' past and present unlawful housing practices;

D.     Order other affirmative relief necessary to eradicate the effects of the unlawful housing practices of Defendants PH HHP and Lemle & Wolff;

E.     Direct Defendants to pay for past and future compensatory pecuniary and non-pecuniary losses, including punitive damages, resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

F.     Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law; and

G.     Award such additional relief as justice may require.


Dated: November 2, 2020

                                            Respectfully submitted,

                                            ___s/ Jillian T. Weiss_____

                                            Jillian T. Weiss, Esq.
                                            Law Office of Jillian T. Weiss, P.C.
                                            442 15th Street, No. 1R
                                            Brooklyn, New York 11215
                                            (845) 709-3237
                                            Fax: (845) 684-0160
                                            jweiss@jtweisslaw.com